Clarence NUNN, Plaintiff,

v.

NATIONAL FRESH FRUIT AND
VEGETABLE COMPANY, INC.
et al., Defendants.

Civ. A. No. H–80–1529.

United States District Court,
S. D. Texas,
Houston Division.

June 10, 1982.

Linda McKeever Bullard, Penrice & Bullard, Houston, Tex., for plaintiff.

A. Martin Wickliff, Jr., Fullbright & Jaworski, Houston, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

McDONALD, District Judge.

Defendants have filed a Motion for Summary Judgment asserting two grounds in support of their contention that they are entitled to judgment as a matter of law, pursuant to Rule 56 of the Federal Rules of Civil Procedure. First, defendant General Drivers, Warehousemen and Helpers Local Union 968 [hereinafter "the Union"] asserts the record herein contains no genuine issue of any material fact and no evidence that defendant union breached its duty of fair representation to the plaintiff. Second, defendant National Fresh Fruit and Vegetable Company, Inc. [hereinafter "National" or "Company"] contends there are no genuine issues of any material fact and no evidence that plaintiff was terminated without just cause.

This suit was instituted by Clarence Nunn [hereinafter "plaintiff"] against National and the Union. Plaintiff, a former

employee of National, alleges National suspended and subsequently discharged him without just cause in violation of the collective bargaining agreement between National and the Union. Plaintiff also alleges the Union failed to process his grievance challenging his dismissal and thereby breached its duty of fair representation.

The Union contends it did not breach its duty of fair representation to plaintiff. It asserts that after a thorough review of the objective evidence and meetings with plaintiff and representatives of National, the Union determined insufficient evidence existed to warrant taking plaintiff's grievance to arbitration. Consequently, the decision was made to withdraw the grievance for lack of merit. National contends there was just cause for plaintiff's termination since the overwhelming, credible evidence showed plaintiff was found to have violated a well established rule of the Company regarding the carrying of weapons on Company property.

After considering the record, the relevant law, and the arguments of the parties in memoranda and at oral hearing, the Court concludes defendants' Motion for Summary Judgment must be granted in part.

A litigant is entitled to summary judgment when, on viewing the case in a light most favorable to the opposing party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *U. S. v. R&D One Stop Records, Inc.*, 661 F.2d 433, 435–36 (5th Cir. 1981). On a summary judgment motion, the inferences to be drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Thus, when conflicting inferences can be drawn from the underlying facts contained in the record, summary judgment is inappropriate. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Accord, *O-Boyle Tank Lines, Inc. v. Bechkam*, 616 F.2d 207, 209 (5th Cir. 1980); *Marshall v. Victoria Transportation Co., Inc.*, 603 F.2d 1122 (5th Cir. 1979). How-

ever, "when a movant makes out a convincing showing that genuine issues of fact are lacking, ... the [non-moving party must] adequately demonstrate by receivable facts that a real, not formal, controversy exists, ..." *Bruce Construction Corp. v. United States*, 242 F.2d 873, 875 (5th Cir. 1957).

Plaintiff may pursue his claim of unlawful discharge against National only if he establishes that the Union violated its duty of fair representation in the processing of his grievance. Only by alleging and proving such a breach of duty by the Union can plaintiff avoid the bar which the contractual grievance procedure otherwise presents to his suit against National. *Hines v. Anchor Motor Freight*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1975); *Cox v. C. H. Masland & Sons, Inc.*, 607 F.2d 138, 144 (5th Cir. 1979). In order to demonstrate a breach of the duty of fair representation, the plaintiff must establish that the Union's refusal to prosecute his grievance through arbitration was "arbitrary, discriminatory or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 193, 87 S.Ct. 903, 918, 17 L.Ed.2d 842 (1967). The Fifth Circuit has recognized "that summary judgment can be a proper method for disposing of fair representation cases where material issues of fact have been settled by depositions and affidavits [citations omitted]." *Turner v. Air Transport Dispatchers Association*, 468 F.2d 297, 299 (5th Cir. 1972). The inquiry before this Court, therefore, is whether the evidence when considered within the framework of the applicable law, creates a genuine material fact issue regarding the Union's fulfillment of its duty of fair representation. In order to resist defendants' summary judgment motion, plaintiff must produce evidence from which one might reasonably infer that the Union processed plaintiff's grievance against National in a "perfunctory fashion" or acted in a manner which might be characterized as "arbitrary, discriminatory or in bad faith." *Vaca v. Sipes, supra* 386 U.S. at 193, 87 S.Ct. at 918; *cf. id.* at 191, 87 S.Ct. at 917; *Lomax v. Armstrong Cork Company*, 433 F.2d 1277, 1281 (5th Cir. 1970).

The pleadings, affidavits, depositions and exhibits on file with the Court show the following, essentially undisputed, facts:

(a) Defendant National and the Union entered into a collective bargaining agreement ("contract") effective from July 17, 1977 to July 13, 1980, which defined the wages, hours, and terms and conditions of employment of National's employees (Exhibit No. 1).[1]

(b) Article III of said contract contains a management rights clause, which reserves to management the right to establish and maintain rules and regulations which govern the conduct of the drivers, as well as the discipline to be administered to them.[2] Pursuant to Article III of the contract, National prepared its Rules and Regulations (Exhibit No. 2). Plaintiff was charged with violating Rules A–13 and A–14[3] pertaining to recklessness and the carrying of weapons on Company premises.[4]

(c) Article XX of the contract governs the procedures the Union must follow in order to contest the suspension or discharge of an employee.[5]

---

1. All exhibits referred to herein unless noted otherwise, are those attached to Defendants' Memorandum in Support of their Summary Judgment Motion.

2. Article III provides:

The management of the business and the direction of the working forces, including the right to plan, direct and control operations, hire, suspend or discharge for proper cause, transfer or relieve employees from duty because of lack of work or for other legitimate reasons, the right to study or introduce new or improved production methods or facilities, and the right to establish and maintain rules and regulations covering the operation not in conflict with this Agreement, a violation of which shall be among the causes for disciplinary action or discharge, are vested in the Employer, provided, however, that this right shall be exercised with due regard for the rights of the employees and provided further, that it will not be used for the purpose of discrimination against any employee or for the purpose of invalidating any contract provisions.

3. The General Rules and Regulations provide in relevant part:

A. Any employee found guilty of violating any of the following regulations shall be subject to disciplinary action.
*  *  *  *  *  *
13. Recklessness, while on duty, resulting in a serious accident to persons or damage to Company property.
14. Carrying weapons on your person while on Company premises.
*  *  *  *  *  *

4. "Premises," for purposes of this rule, was interpreted by both National and the Union to mean all company property including trucks (Fuller Deposition, p. 36, 1. 23 to p. 37, 1. 2; Daigle Deposition, p. 46, 1. 16–17; p. 48, 1. 13–14). Plaintiff failed to adduce any evidence creating a genuine fact issue with respect to this definition.

5. Article XX provides in pertinent part:

In any case of discharge or suspension which the Union wishes to contest, the Union must within five (5) working days (excluding Saturdays, Sundays and holidays) after such discharge or suspension notify and meet with the Employer. Such grievance must be taken up promptly and if the Employer and the Union fail to agree within two (2) working days (excluding Saturdays, Sundays and holidays) a board of arbitration shall be notified on the next working day. The selection of a third member, if required, and the processing of the grievance shall be as outlined in Step 4–A and/or Step 4–B of Article IV—Grievance Procedure.
*  *  *  *  *  *
Steps 4–A and B of Article IV provide:
Step 4–A. In the event the last step fails to settle the complaint, it shall be referred to a two (2) man committee. One (1) member of such committee shall be designated by the appropriate officer of the Teamsters International and the other member shall be designated by the appropriate officer of the Company. Such committee shall have power to settle the grievance, and such settlement shall be final.
Step 4–B. In the event the committee in Step 4–A cannot reach agreement, the dispute may be submitted to arbitration by either party within ten (10) days and a third member shall be chosen by the arbitration board. Should the arbitration board be unable to agree on a third member within five (5) days, the Federal Mediation and Conciliation Service shall be asked to furnish a list of qualified persons from which the representative of the Union and the representative of the Employer shall endeavor to select the third member. If the parties are unable to select the third member from this list, they shall request a new list from the Federal Mediation and Conciliation Service, from which, by striking out names, the third arbitrator shall be selected. The arbitration board shall within ten (10) days after being

(d) Plaintiff reported to work on December 7, 1979 [6] at 1:00 a. m. At that time, plaintiff's position with the Company was that of a driver (Plaintiff's Deposition, p. 9, 1. 8–9). Plaintiff regularly drove a delivery route to the Beaumont area. However, on this particular morning plaintiff was asked to drive a different route on the other side of Beaumont (Plaintiff's Deposition, p. 10, 1. 16 to p. 11, 1. 7). Before plaintiff left that morning for his route he went to his car and obtained a pistol, which he inserted in his satchel; the satchel was placed in the cab of his truck (Plaintiff's Deposition, p. 110, 1. 7–17).

(e) Plaintiff testified that he retrieved his pistol from his car on the morning of December 7 because he had heard of previous attacks on drivers who drove the Beaumont route (*See* Section III paragraph 12 of Plaintiff's Complaint; Plaintiff's Deposition, p. 99, 1. 24 to p. 102, 1. 9). Plaintiff never advised anyone that he was taking a gun with him in the cab of his truck (Plaintiff's Deposition, p. 105, 1. 14 to 106, 1. 12).

(f) Plaintiff began his route on December 7, by making a delivery in Sour Lake, Texas (Plaintiff's Deposition, p. 15, 1. 12–15). Between Sour Lake and his second delivery stop in Silsby, Plaintiff was involved in a head on collision in which one person was killed (Plaintiff's Deposition, p. 15, 1. 16–25; Exhibit No. 5). The accident occurred on Highway 326 outside of the city limits of Kountze, Texas (Plaintiff's Deposition, p. 16, 1. 1–9).

(g) After receiving medical attention at Hardin County Memorial Hospital, plaintiff was taken to the police station, where he was interviewed by several individuals including a representative from National (Plaintiff's Deposition, p. 19, 1. 3–17, p. 20, 1. 16–25; p. 27, 1. 13–17; Fuller's Deposi-

tion, p. 7, 1. 1–18, p. 9, 1. 2–7). Plaintiff was then taken before a Justice of the Peace and arraigned on the charges of carrying a concealed weapon and driving on the wrong side of the road. Plaintiff plead guilty to these charges (Plaintiff's Deposition, p. 27, 1. 13–22, p. 25, 1. 2–10).[7] Later in the afternoon of December 7, plaintiff was arraigned on the charge of criminal negligent homicide; plaintiff plead not guilty to that charge (Plaintiff's Deposition, p. 26, 1. 7–18).[8] At approximately 1:00 a. m. on the morning of Saturday, December 8, plaintiff's parents posted bond for him and he returned to Houston (Plaintiff's Deposition, p. 28, 1. 23 to p. 29, 1. 6).

(h) In the mean time, Paul Dumas, the National representative sent to investigate plaintiff's accident, informed Willie Fuller, Director of Operations for National, of the charges brought against plaintiff (Fuller's Deposition, p. 9, 1. 9–13, p. 10, 1. 13–16).

(i) When plaintiff arrived home on Saturday morning he telephoned Willie Fuller to inquire about his employment status (Plaintiff's Deposition, p. 28, 1. 1–9, p. 29, 1. 7–9; Fuller Deposition, p. 9, 1. 20–23). Plaintiff testified that during this telephone conversation Willie Fuller initially said plaintiff was terminated, but then retracted that statement and instructed plaintiff to visit with him on Monday morning, December 10, to discuss the matter further (Plaintiff's Deposition, p. 29, 1. 7–12, p. 112, 1. 17–23; Fuller's Deposition, p. 9, 11. 20 to p. 10, 1. 3).

(j) Plaintiff contends he also contacted John Daigle, the Union's Business Agent, on Saturday December 8 to discuss his accident and the charges against him (Plaintiff's Deposition, p. 135, 1. 10–25). Although the record is somewhat confusing on

---

selected, meet for the purpose of hearing the dispute and shall within fifteen (15) days thereafter, make a decision. The decision of the majority shall be final and binding on both parties. Expenses of the neutral arbitrator shall be borne equally by the Union and the Company.

**6.** All dates herein will refer to 1979, unless noted otherwise.

**7.** Plaintiff knew that state law prohibited the carrying of concealed weapons (Plaintiff's Deposition, p. 111, 1. 17–24).

**8.** Plaintiff testified he had been temporarily blinded by the oncoming vehicle's headlights (Plaintiff's Deposition, p. 17, 1. 1–2, 20–21).

this point, (*see* Plaintiff's Deposition, p. 42, 1. 3–13, p. 49, 1. 1–6, p. 65, 1. 18–23, p. 66, 1. 7–10; Daigle's Deposition, p. 23, 1. 9–11, 1. 16–22, p. 24, 1. 4–7, p. 25, 1. 8–16) the Court assumes plaintiff's recollection of the facts on this issue is accurate.

(k) On Monday morning, December 10, plaintiff first visited with John Daigle at his office (Plaintiff's Deposition, p. 35, 1. 2–5, p. 70, 1. 21–24; p. 72, 1. 3–11; p. 85, 1. 21–22, p. 134, 1. 20–25; Daigle Deposition, p. 25, 1. 14–20).[9] At that meeting, plaintiff informed Daigle he had talked with Fuller and that Fuller wanted to discuss plaintiff's job status on that morning (Plaintiff's Deposition, p. 72, 1. 18–23). Plaintiff and Daigle discussed the accident and the various offenses of which plaintiff was charged by the Police Department of Kountze, Texas (Plaintiff's Deposition, p. 38, 1. 15–22, p. 72, 1. 24 to p. 73, 1. 23; Daigle Deposition, p. 26, 1. 14–25). With respect to the accident, plaintiff explained to Daigle that he had been temporarily blinded and he really did not know how the accident occurred (Daigle Deposition p. 26, 1. 16–19). During that meeting, Daigle apprised plaintiff that he would probably be put on an indefinite suspension (Plaintiff's Deposition, p. 136, 1. 1–4). Daigle also informed plaintiff there would be problems with his case and that there was a possibility he would be discharged as a result of these events (Plaintiff's Deposition, p. 87, 1. 25, to p. 88, 1. 3, p. 112, 1. 3–13; Daigle Deposition, p. 26, 1. 25 to p. 26, 1. 3). After plaintiff and Daigle

discussed plaintiff's case Daigle told plaintiff he would file a grievance on plaintiff's behalf and directed him to go to Fuller's office where he would meet him shortly (Plaintiff's Deposition, p. 38, 1. 23–25, p. 85, 1. 23–25, p. 136, 1. 3–7; Daigle Deposition, p. 25, 1. 24 to p. 26, 1. 10).

(*l*) Plaintiff arrived at Fuller's office approximately five to ten minutes before Daigle arrived (Plaintiff's Deposition, p. 89, 1. 13–15; Fuller Deposition, p. 10, 1. 23). Prior to Daigle's arrival, plaintiff received his notice of disciplinary action which outlined the three charges Paul Dumas had related to Fuller after plaintiff's December 7th accident (Fuller's Deposition, p. 10, 1. 10–16). The charges reflected in the disciplinary action were "carrying a weapon, driving on the wrong side of the highway, careless operation of equipment" and "criminal negligent felony offense" (Plaintiff's Deposition, p. 86, 1. 23 to p. 87, 1. 3, p. 90, 1. 7–9; Fuller's Deposition, p. 10, 1. 11 to p. 11, 1. 5; Exhibit No. 3). At that time, plaintiff was placed on indefinite suspension.[10] (Plaintiff's Deposition, p. 34, 1. 20–24, p. 89, 1. 14–17; Exhibit No. 3).[11]

(m) After Daigle arrived at the meeting, he and Fuller discussed the circumstances surrounding the pistol that plaintiff had been carrying on the night of the accident (Plaintiff's Deposition, p. 90, 1. 16–25, p. 91, 1. 21 to p. 92, 1. 13; Daigle Deposition, p. 27, 1. 7–19; Fuller Deposition, p. 10, 1. 23 to p. 11, 1. 21). Plaintiff acknowledged that he had plead guilty to the charge of posses-

---

**9.** Plaintiff testified he met with Daigle prior to his meeting with Fuller. Although Daigle's testimony implies plaintiff met with him after meeting with Fuller, the record overwhelmingly supports plaintiff's position. Nevertheless, the Court does not consider the exact sequence of these December 10th meetings to be material to the issue at bar. It is undisputed that Daigle met with plaintiff on December 10, to discuss plaintiff's side of the story.

**10.** When an employee is initially charged with a dischargeable offense, he/she is initially suspended until a further investigation reveals that discharge is, in fact, warranted under the circumstances (*see* Fuller's Deposition, p. 53, 1. 10–11; Plaintiff's Deposition, p. 61, 1. 18 to p. 62, 1. 4, 7–9. Also *see generally*, Daigle's Deposition, p. 16, 1. 12–21).

**11.** Exhibit No. 3, the Notice of Disciplinary Action, contains the remarks "the employee is hereby suspended indefinite until further notice—change to discharge." The copy of the Notice of Disciplinary Action attached to plaintiff's deposition does not include the words "change to discharge" (Company's Exhibit No. 2). The record reveals that Mr. Fuller wrote "change to discharge" on his copy of the Notice of Disciplinary Action after the Union had been furnished a copy of the notice copy on December 10. Mr. Fuller's copy, therefore, is the only one with "change to discharge" so indicated (Fuller's Deposition, p. 40, 1. 3 to p. 48, 1. 5). Plaintiff has not adduced any evidence creating a genuine fact issue on this point.

sion of a concealed weapon (Plaintiff's Deposition, p. 92, 1. 17 to p. 93, 1. 10). Fuller then placed plaintiff on indefinite suspension pending further investigation of the charges outlined in the notice of disciplinary action (Fuller's Deposition, p. 49, 1. 23 to p. 50, 1. 3, p. 53, 1. 9–11). During the meeting Daigle informed Fuller he was filing a grievance on behalf of the plaintiff (Plaintiff's Deposition, p. 88, 1. 4–14; Daigle Deposition, p. 27, 1. 4–5; Exhibit No. 4). Plaintiff understood that the filing of the grievance meant the Union was appealing his indefinite suspension [12] (Plaintiff's Deposition, p. 88, 1. 15–19).

(n) Sometime after December 10 plaintiff obtained a copy of the police report regarding his December 7 accident (Plaintiff's Deposition, p. 147, 1. 17–19). Plaintiff gave a copy of the police report to Daigle sometime prior to January 4, 1980 (Plaintiff's Deposition, p. 115, 1. 3–14; p. 147, 1. 6–19).[13] The police report contained information relevant only to the charges of driving on the wrong side of the road and criminally negligent homicide. (Plaintiff's Deposition, p. 149, 1. 21 to p. 150, 1. 2; see Exhibit 5).[14] After reviewing the police report, Mr. Daigle informed plaintiff it appeared that he (plaintiff) had been in the wrong and the circumstances were in National's favor (Plaintiff's Deposition, p. 148, 1. 3–14, p. 154, 1. 15 to p. 155, 1. 8; Daigle Deposition, p. 31, 1. 8–12).

(o) On December 18, 1980, Daigle and Fuller met again concerning plaintiff's indefinite suspension. After discussing the situation, neither side compromised their positions and the meeting ended without a resolution of the grievance (Daigle Deposition, p. 29, 1. 2–6; Fuller Deposition, p. 12, 1. 16; see Exhibit Nos. 4, 8, and 9). At the conclusion of the meeting, Mr. Fuller changed plaintiff's status from indefinite suspension to discharge (Fuller Deposition, p. 12, 1. 13–14; p. 44, 1. 14–17).

(p) According to Mr. Fuller, plaintiff was finally discharged for carrying a weapon; an act plaintiff admitted committing (Fuller Deposition, p. 12, 1. 10–12; p. 19, 1. 18–22; p. 48, 1. 19–20; p. 49, 1. 17 to p. 50, 1. 5, p. 62, 1. 20–22; p. 64, 1. 23–25).[15] Mr. Daigle apparently understood that plaintiff's discharge was premised on the accident as well as the gun charge (Daigle Deposition, p. 38, 1. 20–24, p. 44, 1. 22–24.[16] Plaintiff was not present at this December 18 meeting (Plaintiff's Deposition, p. 94, 1. 12–21).

(q) Mr. Fuller's deposition indicates that his decision to change plaintiff's indefinite suspension to a discharge was precipitated by Mr. Daigle's repeated inquiries about plaintiff's status [17] (Fuller Deposition, p. 12, 1. 13–14; p. 44, 1. 14–17; p. 48, 1. 20–22; p. 53, 1. 1–18; p. 62, 1. 23 to p. 63, 1. 4, 16–18).

---

**12.** The written grievance report, Exhibit No. 4, reflects that the Union was formally contesting plaintiff's discharge (see also Daigle affidavit, Exhibit No. 8).

**13.** Initially, plaintiff's recollection as to whether he furnished a copy of the police report to Daigle was extremely vague (see Plaintiff's Deposition, p. 93, 1. 21 to p. 94, 1. 11; 1. 114, 1. 23 to p. 115, 1. 2; p. 123, 1. 17–21). Subsequently, however, plaintiff's undisputed testimony revealed that he did in fact furnish a copy of the police report to Daigle (see Plaintiff's Deposition, p. 147, 1. 15 to p. 150, 1. 5; p. 151, 1. 4–14).

**14.** Plaintiff testified the police report also indicated he had been carrying a weapon, however, the Court could not find any such indication on Exhibit No. 5. In addition, witness statements which supposedly were attached to the police report were not included in Exhibit No. 5

(Plaintiff's Deposition p. 148, 1. 15 to p. 149, 1. 15).

**15.** Fuller testified that an employee was not subject to automatic discharge for having an accident or violating one of the Company's rules and regulations (Fuller's Deposition, p. 18, 1. 3–6, p. 31, 1. 13 to p. 32, 1. 17). However, Mr. Fuller gave contradictory testimony on the question of whether an employee was subject to automatic dismissal for carrying a weapon (Id. at p. 29, 1. 1–9; p. 32, 1. 20 to p. 33, 1. 9, p. 34, 1. 24 to p. 36, 1. 20).

**16.** The grievance report, Exhibits No. 4, states "Company doesn't have any proof of what happened or who is at fault for the accident."

**17.** This issue, however, would have to be conclusively resolved by the appropriate finder of fact. The Court makes no determination of this fact issue at this time.

(r) On January 4, 1980, Daigle advised plaintiff by letter that, after reviewing all the facts concerning his discharge grievance, he (Daigle) was dismissing it for lack of merit (Daigle Deposition, p. 29, 1. 22 to p. 31, 1. 1; p. 37, 1. 19–23; Exhibit No. 6). Plaintiff took no immediate action in response to this letter (Plaintiff's Deposition, p. 114, 1. 20–22, p. 160, 1. 3–17).

(s) On February 27, 1980 all criminal charges against plaintiff, which arose out of the December 7th accident, were dropped except the carrying of the weapon charge (Plaintiff's Deposition, p. 129, 1. 6–11). Plaintiff pled nolo contendere on the weapon charge and paid a three hundred dollar ($300.00) fine (Plaintiff's Deposition, p. 159, 1. 17–21; p. 160, 1. 3–7). Plaintiff testified that when he informed Mr. Daigle of his no contest plea, Daigle indicated that the Union may have dropped plaintiff's grievance prematurely (Plaintiff's Deposition, p. 128, 1. 13 to p. 129, 1. 2; p. 160, 1. 24 to p. 161, 1. 7). Although Mr. Daigle did not recall making such a statement (Daigle Deposition, p. 38, 1. 12–17) he did testify that plaintiff's no contest plea and the dismissal of other criminal charges were immaterial to plaintiff's discharge grievance (Daigle Deposition, p. 38, 1. 6–24; p. 44, 1. 16–24).[18]

(t) On February 27, 1980 Daigle requested plaintiff to provide him with a copy of the court records disposing of the various charges.[19] Plaintiff intentionally refused to provide these requested papers[20] and did not contact Daigle again until May or June of 1980 (Plaintiff's Deposition, p. 162, 1. 14–22).

(u) Throughout the pendency of plaintiff's grievance, both before the grievance was dropped and after, plaintiff never supplied Daigle with the names of witnesses or any other evidence which might have sub-stantiated plaintiff's contention that his suspension and discharge were unjust (Plaintiff's Deposition, p. 37, p. 22 to p. 38, 1. 1, p. 144, 1. 6–9, p. 162, 1. 14–16, o. 197, 1. 10–17).

(v) Although plaintiff had previously considered seeking the position of union steward he never discussed this possibility with Daigle (Plaintiff's Deposition, p. 117, 1. 8–16; Daigle Deposition, p. 39, 1. 3–5). Plaintiff did not know when the union steward's term expired (Plaintiff's Deposition, p. 117, 1. 17–18).

The crux of plaintiff's claim of unfair representation is that the Union abandoned his grievance prior to the resolution of the criminal charges which served as the basis of his termination. Plaintiff also complains the Union failed to fully investigate whether or not he was at fault in the December 7th accident. Plaintiff's claims that he had not violated company rules and regulations or that extenuating circumstances justified his violation(s), are immaterial to the issue of whether the Union breached its duty of fair representation.[21]

▮ The duty of fair representation does not require unions to pursue grievance procedures in every case where an employee has a complaint against the employer. *Seymour v. Olin Corp.*, 666 F.2d 202, 208 (5th Cir. 1982). It is well settled that the duty of fair representation "does not confer an absolute right on an employee to have his complaint carried through all stages of the grievance procedure." *Turner v. Air Transport Dispatchers' Association*, 468 F.2d at 299; *Vaca v. Sipes*, 386 U.S. at 191, 87 S.Ct. at 917. Unions have considerable discretion in dealing with grievance matters, provided the treatment of an employee's complaint is neither arbitrary, discrimi-

18. Mr. Daigle apparently does not understand the distinction between a guilty plea and a nolo contendere plea (*see* Daigle's Deposition p. 44, 1. 2–5).

19. For the purposes of this summary judgment motion, the Court accepts plaintiff's testimony that on February 27, 1980 Daigle indicated that the merits of plaintiff's grievance should be reconsidered.

20. Plaintiff apparently provided a copy of these papers to Willie Fuller, yet Fuller was not compelled to reconsider plaintiff's termination (Fuller's Deposition, p. 13, 1. 1–12).

21. The affidavits of Rayford McCloud and Yvonne Bowens, therefore, are insufficient to defeat the Union's summary judgment request.

natory, or in bad faith. *Vaca v. Sipes*, 386 U.S. at 191, 87 S.Ct. at 917. A union may not discharge its representation duties in a perfunctory manner. *Vaca v. Sipes; Hart v. National Homes Corp.*, 668 F.2d 791, 794 (5th Cir. 1982). Subject to the duty of fair representation, a union is entitled to exercise its discretionary power to settle, abandon or even refuse to institute a grievance it believes to be without merit. *Vaca v. Sipes*, 386 U.S. at 191–192, 87 S.Ct. at 917–18; *Freeman v. O'Neal Steel, Inc.*, 609 F.2d 1123, 1126 (5th Cir. 1980); *Turner*, 468 F.2d at 300; *Harris v. Chemical Leaman Tank Lines, Inc.*, 437 F.2d 167, 171 (5th Cir. 1971).

The depositions and exhibits on file with this Court support the finding that the Union did not breach its duty of fair representation with regard to the processing of plaintiff's grievance. Plaintiff asserts John Daigle failed to investigate the validity of plaintiff's contention that he was not at fault in the December 7th accident. It is well established that the duty of fair representation includes the obligation to investigate the merits of an employee's grievance. *Freeman v. O'Neal Steel, Inc.*, 609 F.2d at 1128; *Turner*, 468 F.2d 297. Here, John Daigle met with plaintiff after the accident and discussed the various charges filed against him. At the December 10th meeting with Willie Fuller, plaintiff explained why he felt he was not at fault for the accident (Fuller Deposition, p. 10, l. 17–21; Plaintiff's Deposition, p. 133, l. 2–12, p. 134, l. 1–3, p. 138, l. 22 to p. 139, l. 6) and both plaintiff and Daigle argued plaintiff had sound reasons for carrying a gun in the cab of his truck (Plaintiff's Deposition, p. 133, l. 20–22, p. 139, l. 9 to p. 140, l. 1). At no time did plaintiff suggest the names of any witnesses for Mr. Daigle to interview nor did he apprise Mr. Daigle that he (plaintiff) was dissatisfied with the way Daigle had represented his case to Mr. Fuller (Plaintiff's Deposition, p. 48, l. 13–25). Mr. Daigle subsequently reviewed the police report plaintiff produced for him, yet there was nothing in that report indicating plaintiff was not at fault.

Plaintiff apparently believes it was incumbent upon the Union to pursue his grievance until there had been a judicial resolution of the charges pending against him. Plaintiff fails to cite any authority supporting this position. Moreover, the charges against plaintiff were not dropped until about eight weeks after his grievance was dismissed and approximately eleven weeks after the initial filing of his grievance. The contract between the Union and National requires an expeditious resolution of discharge and suspension grievances.[22] Under the terms of the contract the Union had considerably less than eleven weeks to decide whether to pursue plaintiff's grievance or dismiss it.[23] In light of plaintiff's failure to identify witnesses for the Union to interview, the Court concludes that at the time plaintiff's grievance was dismissed, the Union had done all it was capable of doing short of spending its time and money arbitrating a grievance it apparently determined had little merit. *Accord Encina v. Tony Lama Boot Co.*, 316 F.Supp. 239 (W.D. Tex.1970) 448 F.2d 1264 (5th Cir. 1971).

At most, the Union's dismissal of plaintiff's grievance in January 1980 was an exercise of poor judgment or negligence. It is well established, however, that mere negligence or an honest error in judgment is insufficient to support a claim of unfair representation. *Bazarte v. United Transportation Union*, 429 F.2d 868, 872 (3rd Cir. 1970), *cited with approval in, Coe v. United Rubber, Cork, Linoleum & Plastic*, 571 F.2d 1349, 1351 (5th Cir. 1978) and *Turner*, 468 F.2d at 299. Moreover, plaintiff does not make out even a *prima facie* case of unfair representation by demonstrating that a grievance may have in fact been meritorious. *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. at 571, 96 S.Ct. at 1059; *Turner*, 468 F.2d at 299.

Plaintiff has failed to produce any evidence demonstrating that the Union repre-

---

**22.** *See* n.5 *supra.*

**23.** *See* Daigle's Deposition, p. 18, l. 21 to p. 19, l. 6; l. 24 to p. 20, l. 25.

sented him in bad faith. The mere fact that John Daigle may not have "stood his ground" with Willie Fuller to the plaintiff's satisfaction, does not create a material fact issue regarding bad faith. *Cf. Watson v. International Bro. of T., C., W. & H. of America*, 399 F.2d 875 (5th Cir. 1968).[24] This Court has no authority to review the effectiveness or ineffectiveness of the Union's representation.[25] The Court's inquiry is limited to the issue of whether the representation provided by the Union was arbitrary, discriminatory or conducted in bad faith. *Encina v. Tony Lama Company* at 316 F.Supp. 243–244.

Plaintiff has presented no evidence which infers the Union discriminatorily represented plaintiff during the grievance procedure. Plaintiff's allegation that he was planning to seek the union steward's position and, therefore, John Daigle refused to fairly represent him, is unsupported by any credible evidence. *Cf. Freeman v. O'Neal Steel, Inc.*, 609 F.2d 1123 (5th Cir. 1980) (independent evidence of unfair treatment required).

■ Plaintiff contends the Union's Motion must be denied because neither the Union nor the Company advised him of his termination until sometime after his grievance was dropped. The plaintiff, however, has failed to cite any authority for the proposition that the Union had a duty to notify plaintiff of his termination. *Cf. Whitten v. Anchor Motor Freight*, 521 F.2d 1335 (6th Cir. 1975), *cert. denied*, 425 U.S. 981, 96 S.Ct. 2188, 48 L.Ed.2d 807 (1976)

(lack of notice of grievance status undeterminative of good faith), *cited with approval in, Freeman v. O'Neal*, 609 F.2d at 1127. Moreover, the Court finds this fact issue immaterial in that it is undisputed that the grievance filed on plaintiff's behalf contested a "discharge" (Exhibit No. 4).

The balance of plaintiff's opposition to the Union's summary judgment request, consists of the supposition that if he were given the opportunity to submit this case to the trier of fact, the evidence would reveal several genuine issues of material fact. Such an opposition is insufficient to defeat summary judgment. *Bruce Construction Corp. v. United States*, 242 F.2d 873, 875 (5th Cir. 1957). *See* Rule 56(e) of the Federal Rules of Civil Procedure.

Based upon the evidence in the record, the Court is of the opinion that there are no genuine issues of material fact regarding the Union's failure to adequately represent plaintiff.[26] Plaintiff has introduced no evidence creating an inference that the Union's conduct toward him was arbitrary, discriminatory or in bad faith. Although the Court concludes there are genuine issues of material fact as to whether National wrongfully terminated plaintiff,[27] plaintiff's failure to present a material fact issue regarding the Union's breach of its duty of fair representation, bars him from pursuing his suit against National.

Accordingly, it is hereby ORDERED, ADJUDGED, and DECREED that the Union's Motion for Summary Judgment is GRANTED. It is further ORDERED that Nation-

---

24. In *Watson*, 399 F.2d at 880 the Fifth Circuit observed "we find nothing in the present record to support the contention that the Local or the Teamsters exercised bad faith.... If the representation of the appellants was anything less than enthusiastic, it may well have been due to the Local's well-founded belief that the grievance was unjustifiable."

25. Although plaintiff offered contrary and conflicting testimony as to whether or not he in fact thought John Daigle represented him poorly (*see* Plaintiff's Deposition, p. 127, 1. 3 to p. 128, 1. 5), the Court assumes plaintiff's allegation of incompetent representation was made in good faith.

26. The Fifth Circuit has held that exhaustion of intra-union remedies is an indispensible prerequisite to a civil suit against a union by one of its members, unless that member can show such efforts would be futile. *Local Union 560, Int. Bro. of Team. v. Anchor Motor Frgt., Inc.*, 415 F.2d 212, 216 (5th Cir. 1969); *Calagaz v. Calhoon*, 309 F.2d 248, 259–260 (5th Cir. 1962). *See Anderson et. al. v. Grocers Supply Co., Inc., et al.*, C.A. H–78–1984 (S.D.Tex.Dec. 26, 1979), *rev'd on other grounds, Anderson et. al. v. Grocers Supply Co., Inc.*, 650 F.2d 281 (5th Cir. 1981). This issue, however, was not raised by any of the parties here.

27. *See*, e.g. nn. 15, 17, *supra.*

al's Motion for Summary Judgment is DE-NIED. Nevertheless, for the reasons discussed above, plaintiff's claims against National are hereby DISMISSED.

This is a FINAL JUDGMENT.